# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | |
| | ) | |
| NERA JAMES, | ) | Docket no. 2:17-CR-156-GZS |
| | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON DEFENDANT'S MOTIONS TO SUPPRESS

Before the Court are Defendant's two Motions to Suppress (ECF Nos. 34 & 40). The Court held an evidentiary hearing on the motions on April 4, 2018, at which officers Brian Beauparlant, Nicholas Gagnon, and Zachary Provost testified. After carefully considering Defendant's Motions, the evidence presented, and the briefing from both sides, including the post-hearing briefing, the Court DENIES the Motions.

### I. FACTUAL FINDINGS

Over the course of several months in late 2016, law enforcement received information about a fentanyl distributor nicknamed "King" operating in the Lewiston/Auburn area. Specifically, in October through December 2016, Maine Drug Enforcement Agency ("MDEA") Special Agent Brian Beauparlant and Lewiston Police Department ("LPD") officer Zachary Provost received information from at least four separate sources that "King," a black male from New York in his thirties with noticeable blemishes on his face (1) resided at 91-93 Walnut Street in Lewiston, a multi-unit building at the intersection of Walnut and Shawmut Streets; (2) that he was trafficking fentanyl and sold it in small wax baggies known as "tickets"; (3) that he would go to New York every few weeks and bring back a substantial amount of drugs; (4) that he would

conceal drugs on his person when he was in transit or outside his apartment; (5) that he would meet his customers in the common entryways, stairwells, or hallways of different apartment buildings in the neighborhood around Walnut Street; and (6) that his fentanyl had been linked to several overdoses, including deaths.[1] The officers believed that these sources had all either purchased drugs from "King" or had witnessed others purchasing drugs from him.

On December 19, 2016, during an unrelated criminal investigation, MDEA Special Agent Nicholas Gagnon was speaking with a known drug user and low-level drug dealer in the hallway of her apartment building on Pine Street in Lewiston, one street over from Walnut Street, when he observed a second woman enter the hallway through the building's unlocked front door. When the first woman asked the second what she was doing in the building, the second woman, who was a known drug addict, indicated that she had been sent to the building by an acquaintance, whose name Gagnon recognized as being involved in drug activity, to meet someone. Defendant James then walked into the hallway after entering through the unlocked front door and began to say something to the second woman; however, he abruptly stopped talking and walked out of the building when he observed Gagnon, who had his badge displayed. Gagnon observed that James matched the physical description of "King" and the building tenant subsequently confirmed that he was "King." Gagnon asked the tenant if she purchases drugs from "King" and she responded that she does not because she does not use fentanyl. She further described the color and lack of odor of the fentanyl distributed by "King."

---

[1] Some of the information received by law enforcement indicated that "King" was selling heroin, or selling heroin in addition to fentanyl, but Beauparlant testified at the suppression hearing that is not uncommon for drug users to believe that they are purchasing or using heroin when the substance is in fact fentanyl. Regarding the physical description of "King," several sources also described him as "short," but this does not appear to have been a main factor in leading law enforcement to identify James as "King."

The next day, on December 20, 2016, at approximately 4:45 p.m., Beauparlant, Gagnon, Provost, and MDEA Special Agent Nick Gulliver were in an unmarked rental minivan with Provost driving on Shawmut Street in Lewiston, in the vicinity of many of the buildings where "King" was alleged to meet customers to sell drugs and only a few blocks from 91-93 Walnut Street. It was dusk. The officers observed a man in dark clothing walking in the middle of the roadway in the direction they were driving. The sidewalks on Shawmut Street were accessible at the time and the officers collectively believed that the man was causing a hazard to drivers and to himself, especially considering that he was approaching the well-trafficked intersection with Sabattus Street.

At this point, the exact order of events is unclear. Beauparlant testified to the best of his recollection that Gagnon or Provost called to the man to get out of the street when the vehicle was behind him, the man turned, and the officers then recognized him as "King." Gagnon testified to the best of his recollection that the officers pulled past the man, recognized him as "King," stopped the vehicle, and exited, before telling him to get out of the road. Whatever the exact order of events, by the time the officers passed the man and pulled the minivan over, they had recognized the man as "King." The officers parked the vehicle a short distance up the street from "King" and all four officers exited to speak with him. The officers were in plainclothes but had their credentials on lanyards around their necks and identified themselves as law enforcement. Although they were armed, their duty weapons were concealed.

Gagnon and Provost initially approached who they believed to be "King," Defendant James, advised him to not walk in the road, and asked him for identification. James was unable to produce a form of identification but provided his name and date of birth and stated that he was from Brooklyn, New York. Provost noticed that James had a small knife clipped to his pants

3

pocket and informed James that he was going to take the knife and return it at the conclusion of their interaction simply to ensure officer safety. Provost then removed the knife from James with his consent but did not otherwise search him for weapons. After removing the knife, Provost stepped back ten or fifteen feet towards the officers' vehicle and called in James's name and date of birth to confirm his identity and to perform a routine check for outstanding warrants or conditions of release.

Meanwhile, Gagnon talked to James about the necessity of walking on the sidewalk. Based on James's suspected involvement in drug trafficking, his possession of a knife, and his inability to provide a form of identification, Gagnon asked James if he could pat him down for other weapons. James said that he could, raised his arms from his sides, and permitted Gagnon to pat him down. Gagnon did not locate any other weapons. Throughout these initial interactions, James's cell phone was ringing constantly, which the officers believed to be commonly indicative of drug activity based on their experience.

James was holding a white plastic shopping bag in his hand that contained a tightly wrapped, dark-colored item or substance with a rigid texture.[2] Gagnon asked James what was in the bag and James responded hesitantly that it was a bag. Based on the color and shape of the item in the bag and Gagnon's belief that it could be a package of tightly wrapped marijuana buds, Gagnon asked James if the bag contained "weed" (marijuana) and told him that "weed" is not a big deal. James responded that the bag contained marijuana. When Gagnon reached for the bag, James moved the bag out of his reach. Gagnon inquired whether James had a medical marijuana card, and James responded that he did not. Gagnon then grabbed the bag from James's hand and

---

[2] Although there is some conflict in the officers' testimony about the color of the shopping bag in James's hand, their testimony was consistent that the bag was light enough in color that they could see a darker object contained inside it.

4

inspected its contents. The inspection revealed that the package inside the white plastic shopping bag was a dark plastic shopping bag containing a sock filled with rice. Inside the sock, Gagnon discovered a plastic baggie containing numerous "tickets" of what he suspected to be heroin or fentanyl.[3]

To the point that Gagnon grabbed the bag from James, the interaction with James was conversational, not confrontational. James was polite and cooperative and the officers did not surround him.[4] However, after Gagnon took the bag from James, his demeanor changed; James became visibly nervous and appeared to be looking around as if preparing to flee the scene. For this reason, the officers encircled him while Gagnon inspected the bag. After Gagnon discovered the suspected contraband, the officers arrested James for unlawful trafficking in scheduled drugs and seized his cellular phone. Although it is not entirely clear exactly at what point Provost received confirmation of James's identity from dispatch, Provost was still waiting for the information at the time Gagnon seized the bag. The entire interaction from the time the officers pulled over to the arrest lasted no more than five minutes.

Gagnon recited the *Miranda* warnings to James and he submitted to limited questioning. When asked where he lived, James quickly responded "Walnut" before changing his answer to an address on Pine Street when he was asked a follow-up question.

In January 2017, Gagnon interviewed a source of information, a well-known drug user, who identified "King" as a drug trafficker, reported that she had purchased drugs from him on numerous occasions, and disclosed that he resided at 91 Walnut Street on the second floor. This source provided a physical description of "King" that matched James and identified a photograph

---

[3] The officers later confirmed that the baggie contained seventy-seven "tickets" of suspected heroin or fentanyl.

[4] Beauparlant testified that he remained near the rear of the vehicle while Provost and Gagnon interacted with James. Gulliver's location throughout the interaction is not clear from the record.

5

of James as "King." The source further indicated that "King" had already been arrested. Also in January 2017, Gagnon executed a search warrant on the phone seized from James at his December arrest. Gagnon observed numerous text messages that he believed were drug-related, including text communications in which apparent drug customers referred to the text recipient as "King." Gagnon also observed at least one text message in which the phone user referred to himself as "Dante."

On February 6, 2017, James posted bail and was released subject to conditions, including that "[i]n order to determine if I have violated any prohibitions of this bond regarding alcoholic beverages, illegal drugs, or dangerous weapons, I will submit to searches of my person, vehicle and residence . . . at any time without articulable suspicion or probable cause." (ECF No. 40-2, PageID # 79.)

In February or March of 2017, Gagnon received information that a man known as "Dante," who was arrested in December with a large amount of "heroin," was the source of supply for two women, known drug users in the area. Also in March 2017, Gagnon spoke with a source of information who had been arrested for drug trafficking. The source informed Gagnon that a person she knew as "Dante" was a heroin/fentanyl trafficker and provided a physical description matching James, including mentioning the skin condition on his face. Gagnon also spoke to another source of information who was concerned that the tenant on the second floor of 91 Walnut Street was storing drugs in a shed on the back porch behind that tenant's unit and might also be storing drugs in the shed behind the source of information's unit on the 93 Walnut Street side.

In March or April of 2017, Beauparlant spoke with the owner of the 91-93 Walnut Street building. The owner provided information that James was the named tenant on the lease for the second floor apartment in 91 Walnut; that James had been living in the apartment; and that since

his release from custody in February 2017, there had been an increase in traffic to the apartment that was consistent with drug activity.

On May 3, 2017, while conducting unrelated enforcement operations at 91 Walnut Street, Gagnon and Beauparlant, along with up to three other officers, decided to perform a bail compliance check for James.[5] The second floor apartment lights were on and the officers heard music and voices coming from inside the unit. Beauparlant positioned himself on the building's rear porch area/fire escape with another officer to prevent potential flight. He also checked inside the unlocked storage shed adjacent to the porch area and directly behind the apartment to see if anyone was inside. Meanwhile, Gagnon knocked on the apartment's front door and announced that it was law enforcement. Beauparlant then observed a rear window slowly open and James start to climb out of the window onto the porch area. Beauparlant identified himself as law enforcement and directed James to stop; however, James attempted to retreat back into the apartment through the window. Beauparlant grabbed James and secured him in handcuffs. The officers observed a second occupant inside the apartment and Beauparlant directed him to open the apartment front door, which the second occupant did.

Gagnon and Beauparlant entered the apartment through the front door with James in handcuffs. The officers informed James that they were conducting a bail compliance check pursuant to the search condition of his bail, and James did not dispute that he was subject to that condition. The officers then conducted a search of the apartment, the rear porch area, and the shed. Inside the apartment, the officers found a large sum of money, a digital scale, and a couple of cellphones. Inside the shed, the officers found a sock containing live ammunition on the floor. In

---

[5] Specifically, the Court understands Gagnon and Beauparlant to have testified that they went to 91-93 Walnut Street to assist in the unrelated enforcement operation but decided instead to perform the bail compliance check when they determined that other officers could cover the enforcement operation on the third floor. The exact time of day of the operation is unclear from the record.

7

a void in the shed wall, the officers found a stolen shotgun wrapped in a blanket; two handguns, one fully loaded; a bag containing 600 "tickets" of fentanyl; a small box containing a bag with four grams of crack cocaine and a bag with four grams of heroin; and another digital scale.

Each floor of the 91-93 Walnut Street multi-unit building has a common rear porch area or fire escape that connects the units on the 91 and 93 sides. In addition to being accessible from the rear windows of each unit, the rear porch area on the second floor can be accessed from an interior common hallway, as well as from the porch areas on the floors directly above and below. There is a storage shed on each opposite end of the porch area. The shed adjacent to James's apartment was unlocked on the day of the bail compliance check.[6] In addition to the contraband found by the officers, the shed contained broken children's toys and other refuse.

## II. DISCUSSION

A. First Suppression Motion: December 20, 2016 Interaction

In his first suppression motion (ECF No. 34), Defendant targets his interaction with the police on December 20, 2016, and contends that "[l]aw enforcement lacked the reasonable and articulable suspicion of criminal activity necessary to detain Defendant and search his person and his possessions." (Id., PageID # 57.) Essentially, Defendant contends that law enforcement executed a *Terry* stop that was not supported by reasonable, articulable, particularized suspicion of criminal activity and/or that the search of Defendant's person and possessions exceeded the scope of any lawful *Terry* stop. See Terry v. Ohio, 392 U.S. 1, 30-31 (1968). It appears that the only relevant, physical evidence at issue is the drugs in the shopping bag; the patdown did not

---

[6] The record is unclear as to whether the door to the shed was closed at the time Beauparlant first positioned himself on the rear porch, but the door was open by the time the officers performed the search. It is also unclear whether the door was fitted with a locking mechanism. Finally, the record is unclear as to the origin of the broken glass that can be seen in a photo taken of the porch area during the search. (See Supp. Hr'g Gov't Ex. 4.)

8

reveal any weapons. Defendant does not, and cannot, dispute the legality of his arrest if the officers' actions leading up to the discovery of the suspected drugs were lawful. In other words, the Court readily determines that the officers had probable cause for the seizure and search of Defendant's shopping bag once he admitted to possessing what appeared to be a substantial quantity of marijuana, and, of course, had probable cause to arrest James once they discovered "tickets" of suspected heroin or fentanyl.[7] See United States v. Flores, No. 17-1510, 2018 WL 1940218, at *3 (1st Cir. Apr. 25, 2018) ("An arrest is reasonable if the officer 'has probable cause to believe that an individual has committed . . . [a] criminal offense in his presence.'") (quoting Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001)). The issue, then, is whether the police actions leading up to Defendant's admission regarding marijuana were lawful.

The Court discerns three alternative bases for determining that the December 20 interaction was lawful: either (1) the interaction with Defendant constituted a consensual encounter until Defendant admitted to possessing marijuana; (2) the officers executed a lawful *Terry* stop from the outset based on their reasonable suspicion of criminal activity; or (3) a consensual encounter developed into a lawful *Terry* stop. First, the Court determines that the interaction between Defendant and the officers was a consensual encounter not implicating the Fourth Amendment. As long as they do not act coercively, police officers can ask a person on the street questions and ask him for identification without triggering Fourth Amendment protections. United States v. Ford, 548 F.3d 1, 4 (1st Cir. 2008). It is only when "a reasonable person would not feel free to refuse to answer police questions and proceed along his way" that there is a seizure within the

---

[7] Gagnon testified that the Maine Drug Enforcement Agency does not typically concentrate on marijuana and stated it was his practice to simply dump any small amount of marijuana seized off a person rather than arresting the possessor. However, it is undisputed that possession of the amount of marijuana that Defendant appeared to have in his bag would likely have been a criminal offense under then-existing Maine law. See 17-A M.R.S.A. § 1107-A(1)(F). Defendant has not contended that Gagnon somehow acted improperly by telling him that marijuana was "not a big deal" before Defendant stated that he was in possession of marijuana.

9

meaning of the Fourth Amendment. United States v. Dapolito, 713 F.3d 141, 147 (1st Cir. 2013). To satisfy the reasonable person inquiry, the Court must consider whether the officers made a "show of authority" such that a reasonable person in Defendant's position would have believed he was not free to terminate the encounter and leave. United States v. Belin, 868 F.3d 43, 47 (1st Cir. 2017). Consideration of the relevant circumstances leads the Court to conclude that the encounter in this matter was consensual and not a seizure. Specifically, the officers did not display their weapons or make any show of force; did not raise their voices; did not by their tone or language indicate that compliance with any request was compelled; did not physically touch Defendant without his consent; and did not encircle Defendant, restrict his movements, or otherwise block his path until he had admitted to possessing marijuana. See United States v. Mendenhall, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.) (providing examples of circumstances indicating a seizure); United States v. Fields, 823 F.3d 20, 28-29 (1st Cir. 2016) (discussing cases in which courts determined that a person's movements were not restricted during a police encounter despite the presence of multiple officers). The fact that Defendant was polite and cooperative throughout the initial portion of the encounter underscores that there was no seizure.[8] For these reasons, the Court concludes that the December 20th encounter was consensual until Defendant admitted to possessing marijuana.

Turning to the second alternative basis for the legality of the encounter, the Court determines, in the alternative, that the officers executed a lawful *Terry* stop from the moment they approached Defendant on the street, and did not exceed the bounds of the stop. See United States v. Rasberry, 882 F.3d 241, 247 (1st Cir. 2018) ("Judicial review of a *Terry* stop involves a two-step appraisal. To begin, the stop must be justified at its inception. Then, as the stop proceeds,

---

[8] Because whether a seizure occurred is an objective inquiry, Beauparlant's testimony suggesting that he thought Defendant was not free to leave once the officers approached him does not change the Court's analysis.

the officers' actions must be reasonably related in scope to the circumstances which justified the interference.") (quotation marks and citations omitted). Considering the totality of the circumstances from the perspective of a reasonable police officer, United States v. Romain, 393 F.3d 63, 71 (1st Cir. 2004), from the outset of the interaction the officers possessed reasonable suspicion of ongoing criminal activity based on their identification of Defendant as "King," an active drug trafficker operating in the area.[9] Once they stopped Defendant, they worked diligently to ascertain his identity and to complete the stop; indeed, at the time Defendant admitted to carrying marijuana, Provost was still working to confirm Defendant's identity. See United States v. Pontoo, 666 F.3d 20, 31 (1st Cir. 2011) ("The appropriate length of a *Terry* stop is gauged by whether the officer diligently pursued a reasonable investigative approach calculated to ensure officer safety and, at the same time, confirm or dispel his suspicions.") For these reasons, the Court concludes that the December 20th encounter constituted a proper *Terry* stop from the outset, and that the officers did not impermissibly exceed the bounds of the stop.[10]

Finally, turning to the third alternative basis for the interaction, the Court determines, in the alternative, that a consensual encounter reasonably developed into a *Terry* stop grounded in reasonable suspicion of criminal activity based on (1) Defendant's provision of biographical

---

[9] Defendant faults the officers' reliance on information from multiple sources who were drug users or drug dealers and may have been cooperating to receive consideration regarding any potential criminal charges. However, the Court determines that the officers could rely on the information they received to form reasonable suspicion of Defendant's identity and activities because the information was largely based on the sources' first-hand knowledge, included information that was against the sources' penal interest, and was corroborated by Gagnon's direct observation of Defendant's actions in the Pine Street hallway on December 19, 2016. See United States v. Gonsalves, 859 F.3d 95, 103-05 (1st Cir. 2017) (discussing factors for assessing the reliability of information from confidential sources).

[10] The Government appears to contend in the alternative that the officers stopped Defendant based on his apparent violation of a provision of Maine traffic law, which provides that "[w]hen use of a sidewalk next to a public way is practicable, a pedestrian may not walk on that public way." 29-A M.R.S.A. § 2056(1). Indeed, Beauparlant testified that he had previously written tickets for walking in the roadway. The Court does not, and need not, opine on this alternative basis given the evidence that the officers had recognized Defendant as "King" by the time they got out of their vehicle to speak with him.

information matching information provided about the drug trafficker "King," (2) Defendant's possession of a knife, (3) his inability (or reluctance) to provide a form of identification, (4) the constant ringing of his cell phone, and (5) the presence of a wrapped bundle that looked like contraband clearly visible inside his shopping bag. See Dapolito, 713 F.3d at 147-49 (recognizing that a consensual encounter can mature into a *Terry* stop based on reasonable suspicion developed during the encounter).

All three alternative avenues lead to the same conclusion: the encounter between Defendant and the officers was lawful. Thus, because the encounter was lawful, Gagnon's seizure and search of the shopping bag, which was based on probable cause developed from Gagnon's close range observation of the bundle in the bag and Defendant's admission that the bundle contained marijuana, was lawful, too.[11]

Defendant also contends that any statements he made to the officers before he was given *Miranda* warnings should be suppressed.[12] But the evidence indicates that Defendant was not in "custody" for *Miranda* purposes before he was arrested. See United States v. Sweeney, No. 17-1325, 2018 WL 1736610, at *3 (1st Cir. Apr. 11, 2018) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)) (explaining that the prosecution may not use statements made during *custodial interrogation* without the defendant being advised of his *Miranda* rights). Defendant was not

---

[11] Defendant strenuously argues that the weapons patdown was unlawful, but the relevance of this argument to his suppression motion is unclear given that no weapons were found. Regardless, the Court finds that Defendant consented to the patdown. The Court also notes that the officers may even have had probable cause to arrest Defendant when they first encountered him on the street based on the wealth of information concerning "King." See United States v. Flores, No. 17-1510, 2018 WL 1940218, at *4 (1st Cir. Apr. 25, 2018) ("[P]robable cause exists when an officer, acting upon apparently trustworthy information, reasonably can conclude that a crime has been or is about to be committed and that the suspect is implicated in its commission.") (quotation marks omitted). The Government does not advance that argument, however, and the Court need not rely on it given the multiple other bases for determining that the encounter was lawful.

[12] Although Defendant does not clearly specify what statements he is seeking to suppress, the Court notes that a suspect's name and date of birth are not subject to the exclusionary rule. Navarro-Chalan v. Ashcroft, 359 F.3d 19, 22 (1st Cir. 2004).

12

physically restrained in any way, the interaction to the point of his arrest was brief in duration, the interaction took place on a public street, and the officers did not indicate to Defendant that he was not free to terminate the interaction. See United States v. Rabbia, 699 F.3d 85, 91 (1st Cir. 2012) (outlining factors distinguishing a *Terry* stop from a de facto arrest triggering *Miranda*). Therefore, any statements Defendant made to the officers were not the product of custodial interrogation, and his *Miranda*-related argument is unavailing.

For all these reasons, the Court DENIES Defendant's Motion to Suppress evidence from the December 20, 2016 interaction with law enforcement.

    B.  Second Suppression Motion: May 3, 2017 Search

In his second suppression motion (ECF No. 40), Defendant seeks to suppress evidence seized during the warrantless search of his apartment and the storage shed on May 3, 2017. Regarding the search of the apartment, the Government contends that the search was authorized by the condition of Defendant's bail providing, "I will submit to searches *of my person, vehicle and residence . . . at any time without articulable suspicion or probable cause*." (ECF No. 40-2, PageID # 79) (emphasis added). Based on Circuit precedent, the Court agrees with the Government. In United States v. Gates, 709 F.3d 58 (1st Cir. 2013), the First Circuit considered the lawfulness of a warrantless search of the residence of a pretrial defendant released on bail. Although the Court of Appeals ultimately determined that the defendant had consented to the search, it also held that the search was independently justified by the defendant's bail conditions, which authorized residential searches "*without* articulable suspicion or probable cause." Id. at 63-64. The Court of Appeals held that the district court "supportably found that the search was independently justified by the extant bail conditions. After all, the defendant had agreed, as part of his bail conditions . . . to submit to searches of his person and residence at any time, even in

the absence of articulable suspicion. We see no reason why we should not give the plain language of such a bail condition force and effect." Id. at 64. So here, this Court sees no reason why the plain language of the bail condition allowing for suspicionless searches of Defendant's residence should not be given its full force and effect.[13]

Defendant suggests that the Walnut Street apartment was not in fact his residence, or that the officers did not have enough information to believe that it was his residence. By making this argument, Defendant comes perilously close to arguing against his standing to challenge the search. However, the Court concludes that Defendant was residing at the apartment at the time of the search based on the information provided to law enforcement regarding "King" or "Dante," Defendant's own statement to the officers after his arrest on December 20, 2016, and the information provided by the building owner.[14] The fact that Defendant provided a different address in New York City for his bail bond is not persuasive in light of Gagnon's credible testimony that people often provide false addresses on their bail bonds to avoid just the type of search at issue in this case.

Regarding the search of the shed, the Government argues that the shed was part of Defendant's residence for purposes of the bail conditions search, or, in the alternative, that Defendant did not have a reasonable expectation of privacy in the shed supporting a Fourth Amendment challenge. (See Gov't's Post-Hearing Br. (ECF No. 52), PageID #s 136-38.) The

---

[13] In arguing against the validity of the search, Defendant suggests that officers may effect a warrantless search of a pretrial releasee based upon reasonable suspicion of criminal activity. (See Def.'s Post-Hearing Br. (ECF No. 51), PageID #s 122-24.) Although the Government did not argue that the officers based the search on reasonable suspicion, the Court has little doubt that the officers had reasonable suspicion that evidence of criminal activity would be found in the Walnut Street apartment. However, the Court is not aware of any binding precedent in this Circuit that allows for warrantless searches of *pretrial detainees* based solely on reasonable suspicion absent an applicable bail condition authorizing such a search.

[14] Gagnon testified that the officers found a rent receipt for the apartment in one of the bedrooms, but he could not definitively recall whether Defendant's name was on the receipt.

Court concludes, in the absence of any developed argument on the point by Defendant, that the shed was part of Defendant's residence for purposes of the bail condition broadly authorizing searches of Defendant's "person, vehicle and residence." Even if the Court were to conclude otherwise, however, the Court would conclude in the alternative that Defendant did not have an objectively reasonable expectation of privacy in the shed[15] supporting a Fourth Amendment challenge. See United States v. Aiken, 877 F.3d 451, 453 (1st Cir. 2017) ("To prevail on a claim that a search or seizure violated the Fourth Amendment, a defendant must show as a threshold matter that he had a legitimate expectation of privacy in the place or item searched. . . . [T]he defendant must show both a subjective expectation of privacy and that society accepts that expectation as objectively reasonable.") (quotation marks omitted).[16]

In general, "[i]t is now beyond cavil in this circuit that a tenant lacks a reasonable expectation of privacy in the common areas of an apartment building." United States v. Hawkins, 139 F.3d 29, 32 (1st Cir. 1998). Conducting the required "fact-specific inquiry, taking into consideration the nature of the searched location," United States v. Rheault, 561 F.3d 55, 59 (1st Cir. 2009), the Court concludes that the shed was a "common area" of the Walnut Street building. The shed was unlocked, publicly accessible to all building residents of 91-93 Walnut Street as well

---

[15] The officers found the drugs and guns in a "void" between what looked like a cabinet and the shed wall. The Court does not analyze the void separately from the shed in general. It is logical that if Defendant did not have a reasonable expectation of privacy in the shed, he did not have a reasonable expectation of privacy in the open and readily accessible void, and Defendant does not appear to argue to the contrary.

[16] The First Circuit has explained:

> Under what is known as the "standing" doctrine, the defendant carries the burden of making a threshold showing that he has a reasonable expectation of privacy in the area searched . . . While the Supreme Court noted that this threshold analysis is more properly placed within the purview of substantive Fourth Amendment law than within that of standing, courts continue to refer to it as an issue of "standing."

United States v. Stokes, 829 F.3d 47, 51 & n.7 (1st Cir. 2016) (quotation marks and citations omitted).

as to anyone who entered the building,[17] and contained broken toys and other items not associated with Defendant. See United States v. Werra, 638 F.3d 326, 332 (1st Cir. 2011) (stating that relevant considerations for determining a person's reasonable expectation of privacy in a multi-tenant building include "whether the building contains recognizably separate living units, the residents' right to exclude others from parts of the building, the number of residents, and the formal legal relationship among them") (quotation marks omitted); Rheault, 561 F.3d at 61 (concluding that a third-floor landing was a "common area" in part because "a potentially revolving cast of third-floor tenants and their guests had relatively unfettered access to the" area); United States v. Thornley, 707 F.2d 622, 624-25 (1st Cir. 1983) ("The following factors weigh against an objective expectation of privacy. The door to the storage area was not kept locked. Ready access could be had to that area through a hole in the partition which had been there for several years. . . . In fact, it was regularly used by [certain children in the building] as a play area."); see also United States v. Redmon, 138 F.3d 1109, 1128 (7th Cir. 1998) (Evans, J., concurring) ("[I]t's simply an unfortunate fact of life that in a modern urban setting—a multi-family apartment building, or as here an 8–unit townhouse complex—the area where one can reasonably expect privacy to prevail is very narrow. In a multi-unit apartment building there may in fact be no curtilage except perhaps in a separate area—like a basement storage locker—subject to one's exclusive control.")

Finally, United States v. Paradis, while not directly controlling, suggests that Defendant did not have a reasonable expectation of privacy in the shed to the extent it can be considered part of the rear porch area. 351 F.3d 21, 31 (1st Cir. 2003) (stating that the defendant had no "privacy

---

[17] It is not entirely clear how the officers gained access to the building on May 3, 2017. However, the record suggests that once they had entered the building, they were able to access the rear porch area and the shed without entering into any apartment or passing through any locked door.

interest" in the "back porch" of a multi-family building). The primary factor in favor of Defendant having a reasonable expectation of privacy in the shed may be the shed's proximity to his apartment. That factor, however, is not dispositive in light of the multitude of factors pointing in the other direction. See United States v. Yera, 268 F. Supp. 3d 291, 297 (D. Mass. 2017) ("One factor in [d]efendant's favor [regarding a reasonable expectation of privacy] is the attic door's proximity to [d]efendant's apartment door. However, such proximity does not outweigh the fact that the first-floor tenants had ready access to the attic by walking upstairs.") Defendant, therefore, did not have a reasonable expectation of privacy in the shed triggering Fourth Amendment protection.[18]

For all these reasons, the Court DENIES Defendant's Motion to Suppress evidence from the May 3, 2017 search.

### III. CONCLUSION

For the foregoing reasons, Defendant's Motions to Suppress (ECF Nos. 34 & 40) are DENIED.

SO ORDERED.

        /s/ George Z. Singal  
       United States District Judge

Dated this 1st day of May, 2018.

---

[18] The Court finds Rosencranz v. United States, which Defendant relies on, to be completely inapposite because it concerns an absentee owner's standing to challenge the search of a barn on a farm he owns. 356 F.2d 310, 312-13 (1st Cir. 1966).